# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# ROCK HILL DIVISION

| | |
|---|---|
| Kenny N. White, *on behalf of himself and all others similarly situated*, | Case No. 0:21-cv-01480-SAL |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| New-Indy Catawba LLC *d/b/a* New Indy Containerboard, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Kenny N. White, individually and on behalf of all other persons similarly situated, through his undersigned attorney, alleges as follows:

## NATURE OF THE ACTION

1. This is a private nuisance action seeking redress for Defendant New-Indy Catawba LLC, d/b/a New Indy Containerboard ("New Indy")'s wrongful actions to increase its profits by polluting neighboring properties with noxious and harmful hydrogen sulfide emissions.

2. The paper mill located in Catawba, South Carolina (the "Mill") has operated since 1957. The Mill manufactured paper used in magazines and catalogs. At the end of 2018, however, the Mill was purchased by New-Indy Containerboard, LLC, a joint venture between Schwarz Partners LP and The Kraft Group, LLC, New England Patriots owner Robert Kraft's holding company. New Indy purchased the Mill to convert it from producing paper to producing virgin containerboard.

3. New Indy completed the conversion in November 2020 and began high volume production in February 2021. As a result of the conversion, the Mill ceased sending foul condensate to a steam stripper and incinerator and instead sent all foul condensate to open-air

1

lagoons, so that hydrogen sulfide and other dangerous air pollutants could evaporate into the air. The conversion resulted in an eight- or ninefold increase in the amount of foul condensate piped to the open-air lagoons.

4.Thus, when the Mill began high volume production, persons living and working with a 30-mile radius of the Mill immediately complained of strong, foul odors characteristic of hydrogen sulfide.

5.The South Carolina Department of Health and Environmental Control ("DHEC"), in response to what it describes as "an unprecedented number of complaints received by the agency related to odor," immediately began investigating the odors. By May 7, 2021, DHEC received more than 17,000 complaints of noxious odors.

6.On May 7, 2021, DHEC determined "the odor is injurious to the welfare and quality of life and is interfering with use and enjoyment of property" and ordered New Indy to take actions to remedy the unlawful air pollution released from the Mill. In the order, DHEC determined the odor is injurious to the welfare and quality of life and is interfering with use and enjoyment of property in the area.

7.On May 13, 2021, the U.S. Environmental Protection Agency ("EPA") issued an emergency order under the Clean Air Act, also ordering New Indy to take actions to remedy the unlawful air pollution released from the Mill. In the order, EPA stated that an emergency order was needed because New Indy's actions were so harmful to public health and welfare that is was "not practicable to wait for the commencement of a civil action in the United States District Court."

8.Prior to New Indy's acquisition and conversion of the Mill, air quality in the area was unproblematic. In fact, in 2011, DHEC awarded the Mill the "Spare the Air" outstanding business award for implementing air quality improvements *beyond* regulatory requirements.

9. Of course, New Indy decided to convert the Mill from magazine paper to containerboard to maximize profits. New Indy likewise decided to maximize its profits by abandoning the previous Mill owner's commitment to compliance with air pollution laws and regulations—most obviously, by changing the production process to send all pollutants to open-air lagoons instead of continuing to use specialized equipment to bring pollution levels under the applicable legal limits.

10. Plaintiff brings this proposed class action on behalf of himself and all other persons who, from February 2021 to the present (the "Class Period"), have or had any beneficial interest in any real property located within 30 miles of the Mill.

## PARTIES

11. Plaintiff Kenny N. White is a citizen of North Carolina. He resides at 9932 Mitchell Glen Drive in Charlotte, North Carolina. His residence is within 30 miles of the Mill. He owns his residence and has owned his residence throughout the Class Period.

12. Defendant New-Indy Catawba LLC, d/b/a New Indy Containerboard is a limited liability company organized under the laws of Delaware with its main office in Catawba, South Carolina. New Indy's ultimate parent is New-Indy Containerboard, LLC or New-Indy JV Corp., a joint venture between The Kraft Group, LLC, and Schwarz Partners LP. Upon information and belief, at least one member of New Indy is not a citizen of South Carolina.

## JURISDICTION AND VENUE

13. The Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C. § 1332(d)(1)(B), in which a member of the Class is a citizen of a different state than Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs.

14. The Court has personal jurisdiction over Defendant because the claims asserted in this action arise from Defendant's contacts with South Carolina.

15. Venue is proper in the District of South Carolina under 28 U.S.C. § 1391 because the most substantial part of the events giving rise to the claims in this action occurred in this judicial district.

**FACTUAL ALLEGATIONS**

16. Plaintiff incorporates by reference each of the Findings of Fact in the Clean Air Act Emergency Order, *In re New-Indy Cataba, LLC d/b/a New-Indy Containerboard* (EPA Reg'l Dir. May 11, 2021), issued by the EPA Regional Administrator for EPA Region 4 (attached as **Exhibit A**) as though fully set forth herein. Those Findings of Fact include certain of the below factual allegations.

17. Plaintiff also incorporates by reference each of the Findings of Fact in the Determination of Undesirable Levels and Order to Correct Undesirable Level of Air Contaminants, *In re: New-Indy Catawba, LLC* (DHEC May 7, 2021) issued by the South Carolina Department of Health and Environmental Control (attached as **Exhibit B**) as though fully set forth herein. Those Findings of Fact include certain of the below factual allegations.

18. New Indy operates the Mill in Catawba, South Carolina. New Indy purchased the Mill on December 31, 2018.

19. New Indy received a state construction permit authorizing manufacturing conversions on July 23, 2019. New Indy thereafter closed the Mill between September 2020 and November 2020 to convert manufacturing operations from communication paper products to containerboard. Ex. A ¶ 8.

20.     Prior to the conversion, New Indy sent more than half of the volume of its foul condensate stream, which contained hydrogen sulfide, methyl mercaptan, methanol, and other chemicals, to a steam stripper.  New Indy used the steam stripper and incinerator to control its hazardous air emissions, which also resulted in the removal of hydrogen sulfide and other chemicals from facility air emissions.  New Indy piped the remainder of its foul condensate to the Aeration Stabilization Basin (" ASB") at a rate of approximately 90 gallons per minute ("gpm").  Ex. A ¶ 9.

21.     When the facility resumed manufacturing operations in November 2020 and began higher production rates in February 2021, it began sending all of its foul condensate stream to the ASB in the wastewater treatment facility (at approximately 720–800 gpm), where hydrogen sulfide, methyl mercaptan, methanol and chemicals can be volatilized and emitted to the ambient air.  This practice leads to passive air stripping of hydrogen sulfide into the ambient air given the high volatility of hydrogen sulfide.  Ex. A ¶ 10.

22.     On April 5, 2021, DHEC received a permit application from New Indy requesting the removal of a permit production limit to allow for an increase in the production rate at the facility.  DHEC has not yet acted on that permit application.  Ex. A ¶ 11.

23.     Hydrogen sulfide is a flammable, colorless gas that smells like rotten eggs.  People can smell hydrogen sulfide at low concentrations in ambient air ranging from 0.5 to 300 parts per billion ("ppb").  Ex. A ¶ 12.

24.     Inhalation exposures to elevated concentrations of hydrogen sulfide cause various adverse health effects.  These include, but are not limited to, headache, nausea, difficulty breathing among people with asthma, and irritation of the eyes, nose, and throat.  Ex. A ¶ 13.

25.     On May 7, 2021, DHEC issued a Determination of Undesirable Levels and an Order to Correct Undesirable Level of Air Contaminants. DHEC determined that it had received numerous odor complaints of noxious, foul smelling odors in South Carolina's York and Lancaster Counties, in the vicinity of the Mill, described as rotten egg and chemical odors, from February 2021. Ex. B ¶ 4.

26.     DHEC staff also observed strong, offsite, foul odors in the vicinity of the Mill and several miles away from the Mill that are characteristic of hydrogen sulfide emissions from kraft pulp and paper facilities. On February 22, 23 and 24, 2021, DHEC conducted air, wastewater and landfill inspections at the Facility, and DHEC continues to investigate odors to date. DHEC also investigated other possible sources of odor in the York and Lancaster area, including other air emissions sources, wastewater treatment plants and regulated landfills in the vicinity, ruling them out as possible sources. Ex. B ¶ 17.

27.     By early March 2021, the number of odor complaints to DHEC from Lancaster, York and adjoining North Carolina counties increased dramatically. On March 12, 2021, DHEC set up a public web page to provide updates on its odor investigation and provided a form for residents to report the location of and description of observed odors. By May 7, 2021, DHEC received more than 17,000 complaints of noxious odors from persons living in York and Lancaster counties in South Carolina and in North Carolina. DHEC characterizes this as "an unprecedented number of complaints received by the agency related to odor." Ex. B ¶ 5.

28.     By April 9, 2021, DHEC was actively investigating the source of the strong odors reported in York and Lancaster Counties. DHEC personnel reported experiencing off-site odors on Highway 5, as it crosses the Catawba River near the facility, and in neighborhoods several miles away, in Rock Hill, Lancaster, and Indian Land, South Carolina. Ex. A ¶ 16.

29. DHEC has determined the complaints "indicate the odor is injurious to the welfare and quality of life and is interfering with use and enjoyment of property." Ex. B at 6.

30. Residents in Fort Mill, Indian Land, Rockhill, and Lancaster, South Carolina, and in Charlotte, Matthews, Pineville, and Waxhaw, North Carolina (Lancaster and York Counties in South Carolina, and Union and Mecklenburg Counties in North Carolina), have complained of strong odors emanating from the facility and reported health effects to DHEC. In DHEC's online database, created March 12, 2021, the reported health effects have included nausea (approximately 740 complaints, including those that reported exposure to a "nauseating" odor), headaches including migraines (approximately 650 complaints), nose or throat irritation (approximately 370 complaints), and eye irritation (approximately 360 complaints). Other reported symptoms include coughing, difficulty breathing, asthma "flare ups," and dizziness. As of April 27, 2021, in the approximately five weeks since the DHEC online database was created, the database received approximately 14,000 such complaints, some from residents as far as 30 miles away from the facility. By comparison, in all of 2020, DHEC received approximately five complaints about the facility. Ex. A ¶ 14.

31. Residents have also documented on DHEC's online database a wide range of impacts to quality of life, personal comfort, and wellbeing. This includes hundreds of instances of lost sleep, a desire to stay indoors to avoid odors, and stress and anxiety. Many residents noted: that odors are noticeable inside their homes (more than 2,000 complaints); that they were woken at night due to the odors (more than 600 complaints); and that they did not want to go outside due to the odors (more than 400 complaints). Specific quality of life impacts include: "It [the odors] is preventing our ability to enjoy our home and community," "We basically cannot enjoy our life," and "We are prisoners in our own smelly home." Ex. A ¶ 15.

32. EPA Region 4 also maintains a database to keep track of complaints submitted by residents who live near the facility. During March and April 2021, EPA logged 310 complaints. Some complaints reported odors and a subset included information on health impacts. The most frequently cited symptoms included in the EPA database were headache (80 complaints), burning eyes (52 complaints), nausea (40 complaints), and throat irritation (20 complaints). These are the same four health impacts reported most frequently in the DHEC online database. Ex. A ¶ 17.

33. On April 15, 24, 25, 26, and 27, 2021, EPA inspectors detected unsafe hydrogen sulfide from on-site and nearby locations downwind of the Mill. The EPA inspectors themselves experienced headaches, itchy eyes, and nausea caused by the hydrogen sulfide. Ex. A ¶¶ 19–30.

34. The EPA took measurements at other potential hydrogen sulfide sources in the area (wastewater treatment plants) which excluded those as potential sources for the hydrogen sulfide contaminating the area. Ex. A ¶ 31.

35. On May 3, 2021, at 9:30 a.m., EPA and New Indy held a conference call to discuss restarting the steam stripper. New Indy restarted the steam stripper slowly over the night into the day of May 4, 2021. However, the maximum capacity of the steam stripper is approximately 430 gpm of foul condensate, which is inadequate to accommodate the approximately 800 gpm of foul condensate being produced at the Mill. Ex. A ¶ 34.

36. In 2010, the National Research Council of the National Academies published Acute Exposure Guideline Levels ("AEGLs") for hydrogen sulfide. The evaluation reported three tiers of AEGLs. AEGL-1 concentrations are defined as "the airborne concentration . . . of a substance above which it is predicted that the general population, including susceptible individuals, could experience notable discomfort, irritation, or certain asymptomatic nonsensory effects." Ex. A ¶ 33.

37.     For hydrogen sulfide, the 60-minute AEGL-1 concentrations is 510 ppb. This value was derived from a study that reported headaches among adults with asthma following acute inhalation exposures to hydrogen sulfide. Ex. A ¶ 36.

38.     On April 26, 2021, EPA sampled an offsite hydrogen sulfide average concentration of 669.44 ppb in a 60-minute period. The sampling occurred southeast of the Mill, near the location of the Riverchase Estates development. The DHEC online database includes 14 records of odors detected between 4:00 a.m. and 6:00 a.m. on this date, including multiple complaints submitted by residents who live near where the sample was collected. On one street in the Riverchase Estates development, a resident reported that the odor was "causing coughing" and on another street in this development, residents reported being woken up by the odors and "very intense" odor found throughout a home. Health complaints were also reported by residents who live further away. Ex. A ¶ 38.

39.     In addition to the health impacts as identified above, over 40 years ago, EPA determined sulfur compound air emissions from pulp and paper mills adversely affect the welfare of the public. Kraft Paper Mills, *Standards of Performance for New Stationary Sources*, 41 Fed. Reg. 42012 (Sept. 24, 1976) ("TRS [total reduced sulfur] emissions from kraft pulp mills are extremely odorous, and there are numerous instances of poorly controlled kraft mills creating public odor problems . . . Kraft pulp mills are a major source of TRS compounds . . . TRS emissions from kraft pulp mills are composed primarily of hydrogen sulfide, methyl mercaptan, dimethyl sulfide and dimethyl disulfide . . . TRS compounds can have an adverse effect on public welfare . . . The emissions from each pulp mill surveyed in the study affect an average of 44,000 persons over an area of approximately I00 square miles . . . ."). Ex. A ¶ 39.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities who have or had any beneficial interest in any real property located within 30 miles of the facility 5300 Cureton Ferry Road, SC 29704 during the period February 1, 2021 through the present.
>
> Excluded from the Class are current and former officers and directors of New Indy; members of the immediate families of the officers and directors of New Indy; New Indy's legal representatives, heirs, successors, assigns, any entity in which either of them has or has had a controlling interest; any federal, state, or local governmental agencies; any judges who have decided or are assigned to decide some or all issues in this case; any persons related to a judge in a manner that would disqualify the judge from hearing the case; and any chambers staff working for the assigned judge or other courthouse staff who perform tasks relating to this matter.

41.     Plaintiff reserves the right to revise the Class definition based on facts learned in the course of litigating this matter.

42.     This action is proper for Class treatment under Rules 23(b)(1)(B) and 23(b)(3) of the Federal Rules of Civil Procedure. While the exact number and identities of other Class members are unknown to Plaintiff at this time, Plaintiff is informed and believes that there are many thousands of Class members. Approximately 1,696,019 people live within 30 miles of the Mill. Thus, the Class members are so numerous that individual joinder of all Class members is impracticable.

43.     Common questions of law and fact arise from Defendant's conduct described herein. Such questions are common to all Class members and predominate over any questions affecting individual Class members. These include:

   a. New Indy's production of hydrogen sulfide and other noxious air contaminants and New Indy's release of those contaminants into the atmosphere;

  b. New Indy's violation of applicable federal and state laws and regulations relating to hydrogen sulfide and other noxious air contaminants;

  c. Findings of Fact made by the EPA regarding New Indy's operation of the Mill;

  d. Determinations made by DHEC regarding New Indy's operation of the Mill;

  e. Enforcement actions by EPA and by DHEC against New Indy;

  f. Whether New Indy's actions constitute a private nuisance unreasonably interfering with the use and enjoyment of nearby real property;

  g. Whether, and to what extent, injunctive relief should be imposed on New Indy to prevent such conduct in the future;

  h. Whether the members of the Class have sustained damages as a result of New Indy's wrongful conduct; and

  i. The appropriate measure of damages or other relief.

  44. Plaintiff's claims are typical of those of the Class members because Plaintiff and the other Class members sustained damages arising out of the same wrongful conduct, as detailed herein. Plaintiff and Class members sustained similar injuries arising out of New Indy's wrongful conduct. The injuries of the Class members were caused directly by New Indy's wrongful conduct. In addition, the factual underpinning of New Indy's misconduct is common to all Class members and represents a common misconduct resulting in injury to all Class members. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of Class members and are based on the same legal theories.

  45. Plaintiff will fairly and adequately represent and pursue the interests of the Class. Plaintiff understands the nature of her claims herein, has no disqualifying conditions, and will vigorously represent the interests of the Class members. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class members.

46. Plaintiff has retained competent and experienced class action attorneys to represent her interests and those of the Class members. Plaintiff and Plaintiff's counsel have the necessary financial resources to litigate this class action adequately and vigorously. Plaintiff and counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for them.

47. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual Class member are too small to make it economically feasible for an individual Class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein.

48. The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as New Indy has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

49. The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

50. The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings or incompatible standards of conduct for New Indy. Additionally, individual actions may be dispositive of the interest of all members of the Class, although certain Class members are not parties to such actions.

51. New Indy's conduct is generally applicable to the Class as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, New Indy's practices make declaratory relief with respect to the Class appropriate.

## CAUSE OF ACTION

### COUNT I
### PRIVATE NUISANCE

52. Plaintiff re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

53. Plaintiff brings these claims on behalf of himself and the other members of the Class for an injunction and damages for private nuisance under South Carolina law.

54. EPA has concluded New Indy is "causing or contributing" to the emission of air pollutants within the meaning of Sections 302(g) and 303 of the Clean Air Act, 42 U.S.C. §§ 7602(g) and 7603, by emitting hydrogen sulfide from the facility into the ambient air.

55. Based on evidence it has collected, EPA has concluded the Mill's operations are emitting hydrogen sulfide into the ambient air, and that New Indy's operation of the Mill, as described above, is an imminent and substantial endangerment to public health or welfare or the environment.

56. EPA has concluded it has "compelling evidence that emissions from New Indy's facility are causing adverse public health and welfare impacts among exposed populations," specifically, that "[b]y emitting hydrogen sulfide from the [Mill] into the ambient air in levels that result in the human health symptoms described above, and that adversely affect personal comfort and well-being, Respondent is affecting the public health and welfare within the meaning of Sections 101(b), 302(h) and . 303 of the Act, 42 U.S.C. §§ 740l(b), 7602(h) and 7603."

57. DHEC similarly has concluded "that undesirable levels of air contaminants from operations of the [Mill] exist, such undesirable levels are injurious to human health or welfare or are unreasonably interfering with enjoyment of life or use of property."

58. New Indy owns the Mill subject to the implied obligation that it will use in in such a way as not to prevent others from enjoying the use of their property.

59. New Indy's unlawful pollution is an unreasonable, unwarrantable, or unlawful use by New Indy of its own real property, which substantially and unreasonably interferes with Plaintiff's and Class members' possession of their own real property.

60. New Indy's are reckless, willful, and wanton, in that New Indy intentionally ceased use of pollution controlling devices at the Mill and instead sent all foul condensate to open-air lagoons. New Indy did so even though it knew or should have known a nine-fold increase in pollution in the open-air lagoons would damage public health and unreasonably interfere with the use of nearby properties. New Indy did so anyway because it was motivated by money.

61. By virtue of New Indy's reckless, willful, and wanton acts, Plaintiff and Class members are entitled to an award of punitive damages sufficient to impress upon New Indy the seriousness of its conduct and to deter similar conduct in the future.

62. Plaintiff and Class members therefore are entitled to recover compensatory damages, consequential damages, punitive damages, attorneys' fees and costs, an injunction enjoining New Indy's conduct, and any other relief the Court deems appropriate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant and prays for relief as follows:

a. An order that this action be maintained as a class action and appointing Plaintiff as representative of the Class and appointing the undersigned attorney as Class Counsel in this action;

b. All recoverable compensatory and other damages sustained by Plaintiff and Class members;

c. Compensatory damages for injuries suffered by Plaintiff and Class members in the maximum amount permitted by applicable law;

d. Punitive damages sufficient to impress upon New Indy the seriousness of its misconduct and to deter similar misconduct in the future;

e. A decree requiring New Indy to immediately cease its wrongful conduct as set forth in this Complaint;

f. Statutory pre-judgment and post-judgment interest on any amounts;

g. Payment of reasonable attorneys' fees and costs; and

h. Such other relief as the Court may deem just and proper

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b)(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and all others similarly situated, demands a trial by jury on all questions of fact raised by this Complaint.

        Respectfully submitted,

        s/Phillip D. Barber
        Richard A. Harpootlian (Fed. ID No. 1730)
        Christopher P. Kenney (Fed. ID No. 11314)
        Phillip D. Barber (Fed. ID No.12816)
        RICHARD A. HARPOOTLIAN P.A.
        1410 Laurel Street
        Post Office Box 1090
        Columbia, South Carolina 29202
        Phone (803) 252-4848
        Facsimile (803) 252-4810
        rah@harpootlianlaw.com
        cpk@harpootlianlaw.com
        pdb@harpootlianlaw.com

        Gary V. Mauney (*pro hac vice* forthcoming)
        N.C. Bar No. 22190
        MAUNEY PLLC
        Two SouthPark Center
        6135 Park South Dr, Suite 510
        Charlotte, NC 28210
        704-945-7185
        (888) 340-3666 (facsimile)
        garymauney@mauneypllc.com

        ATTORNEYS FOR PLAINTIFF KENNY N.
        WHITE, ON BEHALF OF HIMSELF AND
        ALL OTHERS SIMILARLY SITUATED

May 18, 2021
Columbia, South Carolina.